560 S.E.2d 406

**In the Matter of Sean Bannon ZENNER, Respondent.**

No. 25418.

Supreme Court of South Carolina.

Heard Jan. 24, 2002.
Decided Feb. 25, 2002.

Attorney General Charles M. Condon and Senior Assistant Attorney General James G. Bogle, Jr., both of Columbia, for the Office of Disciplinary Counsel.

S. Jahue Moore, of Wilson, Moore, Taylor & Thomas, P.A., of West Columbia, for respondent.

PER CURIAM.

In this attorney disciplinary matter, the Commission on Lawyer Conduct filed formal charges against respondent. Respondent filed a response and later agreed to a stipulation of facts. After a hearing, the Panel recommended respondent be given a public reprimand.

## FACTUAL BACKGROUND

The charges against respondent stem from his involvement with a collection agency, the Collect America Network. U.S. Collections, a franchise of Collect America, and the Zenner Law Firm entered into a contract on February 16, 2000.

Refinance America, a wholly owned subsidiary of Collect America, purchased uncollected debt from, for example, credit card companies and forwarded it to Collect America, who then forwarded it to respondent's firm. Collect America would send batches of these accounts in contract form. According to the accounts contract, a placement of the amount with respondent's firm was made for a limited period of 120 days for a contingency fee of twenty-five percent (25%) of any recovered funds.

Collect America operated with two types of franchise agreements, including one in which a private corporation, for example U.S. Collections, bought the franchise and the license to use a particular software (STARS) to collect the debt. As a franchise, U.S. Collections was required to retain an attorney, such as respondent, to collect the debt.

U.S. Collections employed collectors and paid them through respondent's payroll account.[1] Further, U.S. Collections

---

1. Respondent testified the collectors were employees of his law firm and that they each received a W–2 from his law firm.

owned the computers and telephones, and provided respondent with an office for his private practice, adjacent to the property leased by U.S. Collections. All collectors made telephone calls to debtors, identifying themselves as "Zenner Law Firm," in the adjacent building.[2]

Each collector was required to generate collections of $30,000 each month. They were paid a base salary and received a bonus of a percentage of any excess collected over $30,000.

Respondent's first contract with U.S. Collections allowed him ten percent of the total amounts collected and paid his costs, except for payroll. Under his last contract, which was imposed on respondent and not reduced to writing, he received a flat $3,000 per month. U.S. Collections then paid the collectors through respondent's account.

There were no client files in the traditional sense, with all materials relating to the debtors stored on computers owned by Collect America. For example, in the Violet Pfaff Matter, her "file" in the computer was owned by Collect America. This electronic file was respondent's firm's file to the extent that he was representing Collect America and was the attorney collecting debt from Violet Pfaff. Respondent had limited access to the file, and this access ceased when he terminated his relationship with Collect America.

Collectors reported to Jim Wooley and Craig Howard, who were partners/owners of the U.S. Collections franchise. Craig Howard's salary was paid by U.S. Collections through respondent's payroll account.

Respondent did not have the authority to hire and fire collectors without first going through a supervisor employed directly by U.S. Collections. As a result of these disciplinary complaints, respondent attempted to fire a collector, Joyl LaRoy, for violating the Fair Debt Collections Act,[3] but was

---

2. One collector testified that when respondent visited the area where collection calls were made, his supervisors told the collectors to "behave," and to watch their "P's and Q's because he was an attorney."

3. Two statutes govern debt collectors' conduct when contacting debtors. S.C.Code Ann. § 37-5-108 (Supp.2000) prohibits a debt collector from:

told by U.S. Collections that he could not. Respondent represented that he had fired the collector, Billy Melton, for similar conduct, but there was no written document in Melton's personnel file reflecting that he had been fired or discharged.

The collectors, LaRoy and Melton, committed misconduct when contacting debtors. The following matters are based on that conduct.

## Izola Wilson Matter

During a telephone call Wilson received from Melton on June 28, 1999, Melton engaged in the following: (1) offered legal advice; (2) threatened criminal prosecution;[4] (3) referred to the creditor as "my client;" (4) gave a legal opinion that jurisdiction was vested in Richland County; (5) used abusive language by describing Wilson's situation as the same as if she used a gun and robbed the creditor and "ripped them off;" and (6) referred to Wilson's owing of an unpaid debt as equivalent to welfare.

## Violet C. Pfaff Matter

Pfaff, a Michigan resident, was told by one of respondent's employees that, "We don't deal with lawyers or law firms. Tell your lawyer that!" During two separate telephone calls, Pfaff was called a "bloodsucker," a "liar," a "swindler," and a "leech."

---

(1) threatening to use criminal prosecution against the consumer;

(2) communicating with the consumer at frequent intervals during a twenty-four hour period or at unusual hours so that it is a reasonable inference the primary purpose of the communication was to harass the consumer;

(3) communicating with a consumer at any unusual time or place known or which should be known to be inconvenient to the consumer, with convenient time being between 8 a.m. and 9 p.m.;

(4) contacting a consumer at his place of employment after the consumer or his employer has requested in writing that no contacts be made;

(5) using obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

The Federal Consumer Protection Act, 15 U.S.C. §§ 1671, et. seq., also prohibits the debt collector from engaging in the conduct listed above.

4. Melton admitted at the hearing that he would sometimes threaten criminal prosecution when conversing with debtors.

*Greg Leaf Matter*

Respondent, in January 1999, mailed a letter to Ilene Chase, a New Mexico attorney, regarding an attempt to collect a debt on behalf of Wells Fargo in the amount of $5,471.98. The letter was sent to Chase's business address. Thereafter, Chase and/or her husband, Greg Leaf, received a number of telephone calls from respondent's employee. During these conversations, the employee was belligerent, profane, and accused Leaf of making promises to pay and not keeping those promises.

Telephone calls ceased after Leaf wrote a letter to respondent requesting the telephone contact cease pursuant to the Federal Consumer Protection Act.

*Peggie Kay Ungerer Matter*

Ungerer, a Pennsylvania resident, received telephone calls from Melton regarding the collection of a debt. Calls were made to her employer's office twice on July 14, 1999, once on July 15, twice on July 16, twice on July 22, twice on July 23, twice on July 29, twice on July 30, and once on November 18. Calls were also made to her home on July 24 and July 31. During an August 4th telephone call, Melton referred to Ungerer as a "liar." When she returned a call to respondent's firm she spoke with Melton, who again called her "a liar" and hung up on her.

During the July 14th call, Melton threatened criminal prosecution and offered a legal opinion that Ungerer's wages would be garnished, without determining whether garnishment was lawful under Pennsylvania or South Carolina law. During this conversation, Melton also used profane language and called Ungerer back five minutes later.

During a July 16th call, an employee of respondent called Ungerer at her employment and her employer directed him not to call the office again. Respondent's employee began cursing at Ungerer's employer.

Ungerer was also called at home on July 14th. In this call, respondent's employee called her while she was still asleep and directed the person answering the phone to "wake her ... up and put her on the phone." (Expletive deleted).

*Shirley Benson Matter*

Benson, a Texas resident, received a telephone call from one of respondent's employees regarding the collection of a debt. This employee screamed and yelled at Benson, used profanity, called her "very low names," and referred to her as a "worthless deadbeat." Four days later, the employee called Benson at her office while she was on another line. Benson's employer answered the phone and asked respondent's employee if he would like to leave a message. The employee yelled at Benson's employer not to hang up on him. When she did, the employee called back immediately and asked to speak to the manager. When told he was speaking with the manager, the employee began yelling. Benson's employer hung up the telephone. A few minutes later, when Benson's employer picked up the phone to make an outgoing call, respondent's employee was still on the line laughing at her.

*Linda McClain Matter*

McClain, a Nevada resident, received a letter from respondent which advised that his firm had been authorized to offer her a settlement of $1,410.00, a discount from her original debt of $2,851.21. The letter offered to accept six equal payments per month, and concluded that upon receipt, respondent would take the steps necessary to update her credit report. McClain made the payments and they were accepted by respondent's firm.

Thereafter, McClain attempted to receive a response from respondent's law firm to no avail. She wrote a letter of complaint to the North Carolina State Bar which was subsequently forwarded to the Commission on Lawyer Conduct. At his Notice to Appear, respondent testified McClain's case had been marked closed as a result of her making the payments.

*Special Investigator Matters*

A special investigator interviewed a few debtors who had been contacted by Joel LaRoy. Eight debtors reported early morning calls, profanity, and/or threats of criminal prosecution.

## Panel's Findings

The Panel found the following violations of Rule 7(a) of the Rules for Lawyer Disciplinary Enforcement, Rule 413,

SCACR: (1) violating the Rules of Professional Conduct, Rule 7(a)(1); and (2) engaging in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute, Rule 7(a)(5).

The Panel further found respondent, through the actions of the collectors, violated certain rules from the Rules of Professional Conduct, Rule 407, SCACR. The Panel found violations of Rule 4.4, respect for rights of third persons (using means that have no purpose other than to embarrass, delay, or burden a third person); Rule 4.5, threatening criminal prosecution; Rule 5.3, responsibilities regarding non-lawyer assistants (lawyer shall make reasonable efforts to ensure that his firm has in effect measures giving reasonable assurance that non-lawyer employee's conduct is compatible with lawyer's professional obligations, and shall make reasonable efforts to ensure that person's conduct is compatible with those obligations, and shall be responsible for that person's conduct if lawyer has direct supervisory authority over the person, and knows of conduct at time when its consequences can be avoided, but fails to take reasonable remedial action).

The Panel also found respondent had violated Rule 5.4 (professional independence of a lawyer), Rule 5.5(b) (unauthorized practice of law), and Rule 8.4 (violation of a rule of professional conduct), of the Rules of Professional Conduct, Rule 407, SCACR.

The Panel found the following mitigating factors: (1) respondent's inexperience; (2) respondent's full cooperation; and (3) respondent's lack of a disciplinary history. The Panel recommended respondent be given a public reprimand, and that he be directed to pay the costs of the proceedings against him.

## DISCUSSION

The authority to discipline attorneys and the manner in which discipline is given rests entirely with the Supreme Court. *In re Long*, 346 S.C. 110, 551 S.E.2d 586 (2001). The Court may make its own findings of fact and conclusions of law, and is not bound by the Panel's recommendation. *In re Larkin*, 336 S.C. 366, 520 S.E.2d 804 (1999). The Court must

administer the sanction it deems appropriate after a thorough review of the record. *Id.*

■ The Panel's recommendation that respondent be publicly *reprimanded is appropriate.* In the past, we have imposed this sanction for similar conduct. *See, e.g., In re Edens,* 344 S.C. 394, 544 S.E.2d 627 (2001) (attorney publicly reprimanded for failing to properly supervise real estate transactions involving refinancing of client's property without client's knowledge or consent); *In re Cromartie,* 340 S.C. 54, 530 S.E.2d 382 (2000) (attorney publicly reprimanded for, among other things, failing to supervise non-lawyer employees who were responsible for giving correct wiring instructions to lenders for funds to be wired to real estate trust account); *In re Davis,* 338 S.C. 459, 527 S.E.2d 358 (2000) (same); *In re Reeve,* 335 S.C. 169, 516 S.E.2d 200 (1999) (attorney publicly reprimanded for failing to properly supervise non-lawyer employees and assisting person in unauthorized practice of law).

■ Further, we agree with the Panel's finding that respondent violated Rule 5.5(b), of Rule 407, of the Rules of Professional Conduct. Respondent assisted the collection agency in performing activities that constituted the unauthorized practice of law. Pursuant to S.C.Code Ann. § 40–5–320(A) (2001), it is unlawful for a corporation or voluntary association to:

(3) hold itself out to the public as being entitled to practice law, render or furnish legal services, advise or to furnish attorneys or counsel, or render legal services in actions or proceedings;

(4) assume to be entitled to practice law or to assume, use, or advertise the title of lawyer, attorney, attorney at law, or equivalent terms in any language as to convey the impression that it is entitled to practice law or to furnish legal advice, services, or counsel.

*See generally* A.L. Schwartz, Annotation, *Operations of Collection Agency as Unauthorized Practice of Law,* 27 A.L.R.3d 1152 (1969).

U.S. Collections, through its collectors, who were respondent's employees, held themselves out to debtors as being the "Zenner Law Firm." In the Izola Wilson Matter, a collector offered Wilson legal advice, referred to the creditor as "my

client," and gave a legal opinion that jurisdiction was vested in Richland County. In the Peggie Kay Ungerer Matter, a collector offered the legal opinion that Ungerer's wages would be garnished, without determining whether such garnishment was in fact lawful. Therefore, by these actions, U.S. Collections held "itself out to the public as being entitled to practice law." Further, respondent's lack of control over the files and over the hiring and firing of employees lends support to the finding that he assisted in the unauthorized practice of law because the collection agency controlled his actions.

We agree with the Panel and find respondent's conduct warrants a public reprimand.

**PUBLIC REPRIMAND.**